GARY M. RESTAINO
United States Attorney
District of Arizona
JOSEPH BOZDECH
California State Bar Number 303453
Assistant United States Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Email: joseph.bozdech@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br>v.<br><br>$55,489.00 in United States Currency and Two iPhones,<br><br>　　　　　Defendants *In Rem*. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff United States of America brings this Complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules"):

## NATURE OF THE ACTION

1. This is a civil action *in rem* to forfeit property to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 8 U.S.C. § 1324(b)(1), because the defendants in rem constitute or derive from proceeds traceable to violation of a specified unlawful activity, 18 U.S.C. §§ 1956(c)(7) and 1961(1) and 8 U.S.C. § 1324, Bringing in and Harboring Certain Aliens, or a conspiracy to commit such offense.

2. This is civil action *in rem* to forfeit property to the United States pursuant to 8 U.S.C. § 1324(b)(1) and (2), because the defendants in rem are the gross proceeds of

a violation of 8 U.S.C. § 1324, Bringing in and Harboring Certain Aliens, or are property traceable to such proceeds.

3. Venue and jurisdiction in Arizona are based upon 21 U.S.C. § 881(j) and 28 U.S.C. §§ 1355(b) and 1395 as acts and omissions occurred in the District of Arizona that give rise to this forfeiture action. This Court has jurisdiction. 28 U.S.C. §§ 1345 and 1355; 18 U.S.C. § 981(h).

## THE DEFENDANTS *IN REM*

4. The defendants *in rem* consist of the following:

   1. $55,489.00 in United States Currency;
   2. Blue iPhone Pro Max; and
   3. Black iPhone (collectively the "defendant property").

5. The defendant property was seized on February 28, 2023 by the U.S. Department of Homeland Security - U.S. Customs and Border Protection ("CBP"). The defendant property is currently in the custody of CBP.

## INTRODUCTION

6. On February 28, 2023, U.S. Border Patrol Agents stopped Maria Gonzalez's vehicle near Ehrenberg, Arizona and later found the defendant property on her person and in her car.

7. Gonzalez's lone passenger, Hilario Rojas Garcia ("Garcia"), stated he was a Mexican national, had entered the United States illegally from Mexico, and paid to be smuggled from El Paso, Texas to Los Angeles, California, and then to Phoenix, Arizona.

8. Gonzalez admitted that she transported illegal aliens on at least four occasions from Los Angeles to Phoenix and made over $60,000 in total doing so. Gonzalez also said she was paid $15,000 to transport Garcia to Phoenix. Gonzalez said that Item 1 of the defendant property ($55,489.00 in United States Currency) found on her person and in the vehicle was the proceeds of her illegal alien smuggling.

## ALLEGATIONS OF FACT

### Traffic Stop Near Ehrenberg, Arizona

9. On February 28, 2023, U.S. Border Patrol Agents assigned to traffic check duties near Ehrenberg, Arizona received intelligence regarding a gray Nissan Pathfinder, California license plate 8SLB029, involved in possible alien smuggling. U.S. Border Patrol is the mobile, uniformed law enforcement arm of CBP responsible for securing U.S borders between ports of entry.

10. According to the intelligence report, the Nissan Pathfinder had been stopped a week earlier on February 21, 2023, by the Riverside County Vehicle Interdiction Pipeline Enhancement Resource ("VIPER") team in California due to a suspicious travel pattern.

11. According to VIPER, the vehicle had traveled east on U.S. Interstate 10 to Phoenix, and then a short while later traveled west back to Los Angeles via the more northern U.S. Interstate 40. Though a much longer route, smugglers are known to use this travel pattern to avoid law enforcement.

12. During a consensual vehicle search, VIPER found an aftermarket global positioning system ("GPS") tracking device concealed underneath the Nissan Pathfinder's floorboard carpet. Human smuggling groups will often use GPS devices to track the movements of smuggled persons and currency.

13. The driver of the vehicle also provided an implausible travel itinerary.

14. Even though VIPER did not find any contraband or violations, the nonsensical travel itinerary along with the GPS tracker caused VIPER to suspect the vehicle was being used for human smuggling.

15. On February 28, 2023 at about 11 a.m., Border Patrol Agents performing roving patrol in Ehrenberg, Arizona observed the above-mentioned gray Nissan Pathfinder from the earlier VIPER intelligence report at a Flying J gasoline station. The Nissan Pathfinder had a female driver and a male passenger.

16. Soon thereafter, Border Patrol Agents witnessed the Nissan Pathfinder committing multiple traffic violations consistent with those smuggling persons, to include traveling 55 miles per hour in a 70 miles per hour zone and crossing over the center and side lines of U.S. Interstate 10 multiple times.

17. Border Patrol Agents know from training and experience that those involved in human smuggling will drive like this as they are looking for a spot to slow down, exit the vehicle, and run away on foot. This behavior is often successful for the suspects as law enforcement will need to stop the driverless vehicles to protect the public and cannot pursue the drivers fleeing on foot.

18. Based on this behavior, Border Patrol Agents conducted a traffic stop and immigration inspection. The Nissan Pathfinder yielded on U.S. Interstate 10 eastbound, milepost 3, near the Arizona weigh station.

19. Border Patrol Agents approached the vehicle from the passenger side and greeted the female driver and male passenger. The male passenger was in the front seat. No other individuals were in the vehicle. The male passenger remained quiet and stared at the floorboard of the vehicle. Border Patrol Agents recognized the male passenger's behavior as consistent with that of a smuggled migrant.

20. After identifying themselves to the suspects, the Border Patrol Agents questioned the man and woman about their citizenship.

21. The female driver provided a California driver's license that identified her as Maria Gonzalez. She said that she was a U.S. citizen by birth in California.

22. The male passenger provided a Mexican Voter Card which showed his name as Hilario Rojas Garcia. Garcia stated he was a citizen and national of Mexico and had illegally entered the United States from Mexico by walking through the desert over the international boundary near the El Paso, Texas Port of Entry on or about February 25, 2023.

23. Based on Garcia's statements, Gonzalez's driving behavior, and the suspicious history involving the Nissan Pathfinder, Border Patrol Agents performed an

1  inventory search of the vehicle and found approximately $5,000 in different dominations in the middle compartment.

2  24.   Gonzalez said she intended to use this money to look for and rent an apartment in Phoenix.

3  25.   It was at this point that Garcia and Gonzalez were taken into custody for suspected alien smuggling and transported, along with the Nissan Pathfinder and $5,000, to the Blythe, California Border Patrol Station for processing.

4  26.   Blythe, California and Ehrenberg, Arizona are located next to each other and are separated by the Colorado River. The river is the border between the two states in this area.

### Processing in Blythe, California

27.   Gonzalez was searched at the Blythe Station and found to have additional U.S. Currency concealed in her shoes and in her bra. When asked to retrieve the money, Gonzalez said she had $5,000 in her right shoe, $5,000 in her left shoe, and about $30,000 in her breast area. Gonzalez believed she had about $50,000 in all.

28.   When interviewed, Rojas said his family paid the Mexican Peso equivalent of $7,000 U.S. dollars via a direct deposit to have him smuggled to Phoenix, Arizona. Rojas said he made the smuggling arrangements in Chiapas, Mexico.

29.   Rojas said that after he crossed from Mexico into the United States near El Paso, Texas, he was transported, along with three other people, to Los Angeles, California. Once he arrived in Los Angeles, he waited in a minivan for about three hours in a parking lot. The minivan driver then pointed to the gray Nissan Pathfinder and said the vehicle would take him to Phoenix. Rojas was told to leave the minivan and get into the Nissan Pathfinder.

30.   Rojas said he got in the Nissan Pathfinder and a female was in the driver's seat waiting for him. She asked if he was the one going to Phoenix. When he said "yes," she began driving.

31. When she asked where Rojas wanted to be dropped off in Phoenix, he told her at the cross streets of Van Buren and 31st Street. He said this was the location given to him by his friends who were going to pick him up.

32. Rojas said he had never met the driver before and did not know her name.

33. Border Patrol Agents then spoke to Gonzalez. Gonzalez initially said she had met the car's passenger (whom law enforcement had identified as Rojas) about a month ago at a bar. She said his name was Efrain and she was just giving him a ride to Phoenix.

34. Gonzalez said the purpose of the money she was carrying was to buy a house in Phoenix. She, however, was unable to provide an address or description of the house she planned to purchase to the Border Patrol Agents.

35. When confronted about how implausible her travel plans sounded, Gonzalez recanted her original story and admitted to smuggling illegal aliens instead.

36. Gonzalez said she considered herself a freelancer who smuggled people from Phoenix area to Los Angeles.

37. Gonzalez said she charged $16,000 to smuggle Guatemalan nationals to Los Angeles and had made over $60,000 in all from four previous human smuggling trips.

38. She said she communicated and coordinated directly with families of the migrants she smuggled. Gonzalez said families wired her money via Western Union for her smuggling services.

39. Gonzalez said that the over $50,000 she had with her (a combination of the funds found in the vehicle and on her person) came from human smuggling, including the $15,000 she charged Rojas' family to illegally transport him.

40. Gonzalez said she had been stopped on Interstate 10 near Blythe, California by law enforcement about a week earlier, on or about February 21, 2023. She was on her way to Phoenix at the time to pick up an illegal alien she was going to smuggle to Los Angeles. She said she later did.

6

41. Gonzales said she was driving the same Nissan Pathfinder at that time. She said she occasionally used it while smuggling. She said the vehicle belonged to someone known only as "el nino."

42. Gonzalez said she borrowed the vehicle from el nino and he didn't know that she used it to smuggle illegal aliens.

43. A search of the vehicle revealed an aftermarket GPS tracker under the carpet in the brake and accelerator pedal area. The GPS tracker was plugged in with aftermarket connectors attached to the vehicle electrical wire harness.

44. The GPS tracker was consistent with the one identified about a week earlier in the vehicle by VIPER.

45. A receipt for an oil change in the Nissan Pathfinder's was found in the glove box. It was dated February 24, 2023, was signed by Gonzalez, and had the word "Turco" labeled on the top.

46. According to Border Patrol Agents, "Turco" is a nickname for someone who works for the Matul Transactional Criminal Organization ("TCO").

### Gonzalez's Blue iPhone ProMax and the Matul TCO

47. During the Border Patrol Agents' encounter with Gonzalez in Ehrenberg, Arizona, they saw Gonzalez's Blue iPhone ProMax (Item 2 of the defendant property) in plain view.

48. The Border Patrol Agents then noticed an incoming WhatsApp message on the phone from "El Turko" that said in Spanish "canalito dejas los 5,500 ayi." See *Exhibit 1*. According to Border Patrol Agents, translated this means "to leave the 55,000 there."

49. The Border Patrol Agents believe this message links Gonzalez and the Defendant Property to the Matul TCO.

50. According to Border Patrol Agents, "Turko" and "Turco" are names that have appeared in several law enforcement encounters with human smugglers, either mentioned in interviews by smugglers or showing up in the contacts of their phones.

Border Patrol Agents believe that "Turko" and "Turco" are the nicknames of a coordinator for the Matul TCO, if not the chief of the organization.

51. CBP in Blythe, California have encountered and apprehended numerous human smuggling drivers in the Yuma Sector linked to the Matul TCO.

52. Yuma Sector's geographic area corresponds to a rough "Y" shape, comprising the western portions of Arizona, the easternmost areas of California, and the state of Nevada.

53. The Yuma Sector patrols 126 miles of border with Mexico, between the Yuma-Pima County line in Arizona and the Imperial Sand Dunes in California. The sector has responsibility for Yuma, La Paz, and Mojave Counties in Arizona, the Eastern-most areas of Imperial, Riverside, and San Bernardino Counties in California, and the entire State of Nevada.

54. According to Border Patrol Agents, the Matul TCO has safe houses in El Paso, Texas, Albuquerque, New Mexico, Phoenix, Arizona, and Los Angeles, California.

55. The Matul TCO typically transports U.S. currency from Los Angeles to Phoenix. According to smugglers, the money is then used to "buy" illegal immigrants from other smugglers and transport them back to Los Angeles via U.S. Interstate 40, instead of U.S. Interstate 10. Human smugglers take this more northern route back to Los Angeles to avoid contact with law enforcement who are more prevalent on U.S. Interstate 10.

56. Gonzalez admitted to following this pattern on February 21, 2023, in which she drove alone to Phoenix on U.S. Interstate 10 from Los Angeles, picked up an illegal alien there, and then transported him to Los Angeles on U.S. Interstate 40.

57. Gonzalez's human smuggling pattern differed somewhat on February 28, 2023, however, as she was in the process of smuggling Rojas to Phoenix from Los Angeles. The over $55,000 Gonzalez was carrying to Phoenix from Los Angeles may have been intended to "buy" more illegal immigrants to transport back to California.

**Seizure of the Property**

58.     On February 28, 2023, based on Gonzalez's travel itinerary, her suspicious driving behavior, the GPS tracker, the admissions by Gonzalez and Rojas to human smuggling, the driving patterns of the Nissan Pathfinder, and the phone message and repair receipt connecting Gonzalez to the Matul TCO, CBP seized the defendant property as the proceeds of human smuggling. The $55,489.00 in United States Currency seized and identified above as Item 1 of the defendant property was the total amount of funds found in the Nissan Pathfinder and on Gonzalez's person.

**Administrative Claim from Gonzalez**

59.     On April 3, 2023, CBP received an administrative claim from Gonzalez.

60.     Gonzalez stated in the document "I am claiming my $55,489.00 money and my two cell Phon's [sic], iPhone Pro Max Sierra Blue, iPhone Black" and that she was "owner by legal and well documented means".

**SUMMARY**

61.     There is significant evidence that the defendant property is proceeds of 8 U.S.C. § 1324, Bringing in and Harboring Certain Aliens:

    a.  Gonzalez's February 21, 2023 encounter with VIPER in which a GPS tracker was found under the Nissan Pathfinder's carpet and Gonzalez provided an illogical travel itinerary;

    b.  Gonzalez's suspicious driving behavior on February 28, 2023;

    c.  Gonzalez's nonsensical story regarding her travel itinerary at the February 28, 2023 traffic stop;

    d.  Rojas' admission that he was a Mexican national, had walked illegally into the United States, and that his family paid Gonzalez $7,000 to transport him from El Paso, to Los Angeles, and then to Phoenix;

    e.  Gonzalez's admission that she lied about her travel itinerary;

    f.  Gonzalez's admission that Rojas paid her to illegally drive him from Los Angeles to Phoenix;

    g. Gonzalez's admission that she had smuggled illegal aliens on at least four occasions in the past and made approximately $60,000 doing so;

    h. The $55,489.00 found in Gonzalez's vehicle, her shoes, and her bra;

    i. Gonzalez' admission that the $55,489.00 found was the proceeds of her human smuggling; and

    j. The message found in her Blue iPhone ProMax from "Turco" as well as the vehicle repair receipt with "El Turko" written on it.

### FIRST CLAIM FOR RELIEF

The defendant property constitutes or derives from proceeds traceable to a violation of a specified activity, 18 U.S.C. §§ 1956(c)(7) and 1961(1) and 8 U.S.C. § 1324, Bringing in and Harboring Certain Aliens, or a conspiracy to commit such offense, and therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 8 U.S.C. § 1324(b)(1).

### SECOND CLAIM FOR RELIEF

The defendant property is the gross proceeds of a violation of 8 U.S.C. § 1324, Bringing in and Harboring Certain Aliens, or is property traceable to such proceeds, and therefore is subject to forfeiture to the United States pursuant to 8 U.S.C. § 1324(b)(1) and (2).

### PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that process issue for an arrest warrant *in rem* issue for the arrest of the defendant property; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court deems just and proper, together with the costs and disbursements of this action.

Respectfully submitted this 30th day of June, 2023.

>GARY M. RESTAINO
>United States Attorney
>District of Arizona
>
>*S/Joseph Bozdech*
>JOSEPH BOZDECH
>Assistant United States Attorney